

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>PETRÓLEO BRASILEIRO S.A. – PETROBRAS, PETROBRAS GLOBAL FINANCE B.V., MARIA DAS GRAÇAS SILVA FOSTER, ALMIR GUILHERME BARBASSA, MARIÂNGELA MONTEIRO TIZATTO, JOSUÉ CHRISTIANO GOMES DA SILVA, DANIEL LIMA DE OLIVEIRA, JOSÉ RAIMUNDO BRANDÃO PEREIRA, SÉRVIO TÚLIO DA ROSA TINOCO, PAULO JOSÉ ALVES, GUSTAVO TARDIN BARBOSA, ALEXANDRE QUINTÃO FERNANDES, MARCOS ANTONIO ZACARIAS, CORNELIS FRANCISCUS JOZEF LOOMAN, THEODORE MARSHALL HELMS, BB SECURITIES LTD., CITIGROUP GLOBAL MARKETS INC., ITAÚ BBA USA SECURITIES, INC., J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, SANTANDER INVESTMENT SECURITIES INC., BANCO VOTORANTIM NASSAU BRANCH, MITSUBISHI UFJ SECURITIES (USA), INC., HSBC SECURITIES (USA) INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, STANDARD CHARTERED BANK, BANK OF CHINA (HONG KONG) LIMITED, BANCO BRADESCO BBI S.A, BANCA IMI S.P.A., and SCOTIA CAPITAL (USA) INC.,<br><br>　　　　　　　　　　　Defendants. | No. **14 CV 10117**<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL<br><br> |

Plaintiff City of Providence ("Providence" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated. All allegations are made upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Petróleo Brasileiro S.A. – Petrobras ("Petrobras" or the "Company") and its wholly-owned subsidiaries Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and other publicly available information concerning Petrobras and (as defined herein), the Individual Defendants, the Officer and Director Defendants, and the Underwriter Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who, between January 22, 2010 and November 21, 2014, inclusive (the "Class Period"), purchased or otherwise acquired the securities of Petrobras, including debt securities issued by PifCo and PGF, on the New York Stock Exchange (the "NYSE") or pursuant to other domestic transactions (the "Class"). The Exchange Act claims allege that certain Defendants engaged in a fraudulent scheme to artificially inflate the price of Petrobras securities, including the debt securities issued by PifCo and PGF, during the Class Period.

2.      This action also is brought pursuant to the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased certain debt securities issued by PifCo and/or PGF pursuant and/or traceable to any of three public offerings registered in the United States.  In a debt offering on or about February 6, 2012 (the "2012 Offering"), PifCo sold approximately $7 billion in notes at four sets of interest rate and maturity terms (the "2012 Notes").  Through a second debt offering on or about May 15, 2013 (the "2013 Offering"), PGF sold approximately $11 billion in notes at six sets of interest rate and maturity terms (the "2013 Notes").  PGF sold approximately $8.5 billion in notes (the "2014 Notes" and together with the 2012 Notes and 2013 Notes, the "Notes") at six sets of interest rate and maturity terms in a third debt offering on or about March 11, 2014 (the "2014 Offering" and, together with the 2012 Offering and the 2013 Offering, the "Offerings").

3.      Pursuant to the Securities Act, Defendants are strictly liable for material misstatements in the Offering Documents (as defined herein) issued in connection with the Offerings, and these claims specifically exclude any allegations of knowledge or scienter.  The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants—*i.e.*, the Securities Act claims do not allege, arise from, or sound in, fraud.  Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

4.      The Exchange Act and Securities Act claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants in the Offering Documents and throughout the Class Period, about the value of Petrobras' assets, the amounts of the Company's periodic expenses and net income, and whether the Company suffered from material weaknesses in its disclosure controls and procedures and

internal controls over financial reporting. The revelation of the truth about Petrobras through a series of disclosures caused a precipitous decline in the market value of Petrobras, PifCo, and PGF's securities, resulting in significant losses and damages to Plaintiff and the Class.

## II.     FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS

5.     Petrobras is an integrated oil and gas company incorporated in the Federative Republic of Brazil ("Brazil") with operations in all stages of the petroleum production process, including exploration, refining, and marketing. As part of the Company's operations, it purchases and contracts for the construction of equipment, facilities, and other assets used in its oil and gas operations.

6.     Prior to and throughout the Class Period, Petrobras pursued plans to expand its production capacity. These plans involved acquiring and contracting for the construction of new facilities and petroleum production assets. For example, in 2006, the Company acquired a 50 percent interest in an oil refinery in Pasadena, Texas (the "Pasadena Refinery") for $360 million, with plans to double the facility's 100,000-barrel-per-day capacity. In 2010, Petrobras modified the construction plans of the Complexo Petroquimico do Rio de Janeiro ("COMPERJ"), a project originally launched in 2004 to construct a 150,000-barrel-per-day petrochemical refinery complex in Rio de Janeiro, Brazil at a cost of $6.1 billion, substantially expanding the plans and raising the total cost to an estimated $26.87 billion.

7.     Petrobras' expansion plans also required substantial capital investment. In order to satisfy the Company's capital requirements, Petrobras undertook a number of securities offerings during the Class Period, selling more than $98 billion in securities registered on the NYSE including notes and American depositary shares ("ADSs") representing common and preferred stock.

8.      Prior to and during the Class Period, the Company facilitated a scheme in which contractors paid bribes to certain influential individuals in Petrobras and other organizations in exchange for the award of lucrative oil and gas construction contracts.  Petrobras compensated the contractors for these bribes by paying inflated amounts under the contracts.

9.      Petrobras capitalized these bribe repayments, treating them as costs related to the construction, installation, and completion of oil and gas infrastructure and recording them as part of the value of the acquired assets on the Company's balance sheet.  Petrobras then recognized expenses for the depreciation of these assets—including the portion related to bribes—over subsequent periods.  Petrobras further calculated and reported the Company's periodic net income based, in part, on these expense figures.

10.     During the Class Period, Petrobras asserted that it accounted for its acquisitions and the assets from its construction projects in accordance with Generally Accepted Accounting Principles ("GAAP") or International Financial Reporting Standards ("IFRS"), claiming its acquired or constructed assets to have values equal to the reported costs incurred in their acquisition or construction.

11.     GAAP and IFRS set forth the circumstances under which a company may capitalize and depreciate expenditures.  For example, under IFRS, the costs that a company may capitalize for an asset constructed under contract include: (1) costs that relate directly to a specific contract; (2) costs that are attributable to contract activity in general and can be allocated to a contract; and (3) such other costs as are specifically chargeable to a customer under the terms of a contract.  With regard to an asset that a company acquires, a company may capitalize the cost to acquire property, plant, and equipment along with construction and other expenditures

necessary to bring these assets into working condition. GAAP and IFRS provide that an item of property, plant, or equipment should be measured at its cost when acquired.

12.     Petrobras' reported asset values were important information for purchasers of the securities of Petrobras, PifCo, and PGF during the Class Period because these measures were understood to offer a fair presentation of the Company's fixed capital and recoverability for creditors. These reported asset values were used by rating agencies, analysts, and investors to arrive at a number of metrics including the Company's financial leverage (the ratio of net assets to total net debt) and its debt/equity ratio that formed a material basis for the market prices of the securities of Petrobras, PifCo, and PGF.

13.     Throughout the Class Period, Petrobras issued public statements, including financial statements that the Company filed with the SEC, which set forth, among other things: (1) the Company's asset values; (2) the Company's periodic expenses and net income; and (3) the assessment that the Company did not suffer from a material weakness in its disclosure controls and procedures or its internal controls over financial reporting.

14.     These statements were false, in that:

(a)     the periodically reported value of the Company's assets was false and misleading because the costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values;

(b)     had the illegal bribe-related repayments been properly accounted for, the Company would have recognized materially greater expenses and less net income in certain

periods. Accordingly, during the Class Period, the Company's reported expenses and net income were false and misleading;

        (c)    the Company suffered from material weaknesses in: (1) its disclosure controls and procedures, and (2) its internal controls over financial reporting; and

        (d)    Defendants' statements regarding the outlook and prospects of the Company were materially false and misleading at all relevant times.

15.    The truth regarding the false and misleading nature of Petrobras' statements was revealed in a series of disclosures. Initially, on March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote. The announcement went on to note that:

> Director Mauro Rodrigues da Cunha *voted against the approval of the Financial Statements* of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) *lack of information and apparent accounting inadequacy of refinery investments*.[1]

16.    Also on or about March 17, 2014, the Brazilian Federal Police Department (the "DPF") launched an operation code-named "Lava Jato," or "Car Wash." Operation Car Wash focused on a scheme run by black-market money dealers who are thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.

17.    Days later, on or about March 20, 2014, the DPF arrested Paulo Costa ("Costa"), a former senior executive of Petrobras, in connection with Operation Car Wash based on documentation linking Costa to the receipt of a luxury automobile from another individual implicated in the money laundering scheme.

---

[1] All emphases are added.

18.     Then, on April 15, 2014, during the trading session, CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's purchase of the Pasadena Refinery and allegations regarding bribery.  As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts that could have been the subject of participation by Costa.

19.     Later, on October 16, 2014, prior to the trading session, news reports circulated about a report issued by Brazil's federal accountability office, the Tribunal de Contas da União ( the "TCU").  The TCU report criticized the management of the construction of the COMPERJ facility, describing the project's management as "reckless" and identifying concerns about inflated contract costs.  In reaction to this partial revelation of the extent to which Petrobras' construction contracting process was subject to improper overpricing, and the related effects on the reported value of the Company's assets, the market value of certain securities issued by Petrobras, PifCo, and PGF fell.  For example, the Company's common and preferred ADS prices fell $1.05 and $1.30 per ADS, respectively, or 6.75 and 7.87 percent, to close at $14.50 and $15.21 per ADS.

20.     A month later, on November 13, 2014, during the trading session, Petrobras disclosed that it would have to delay its release of earnings results for the third quarter of 2014.  This delay arose in part from the refusal of Petrobras' auditor, PricewaterhouseCoopers ("PwC"), to approve the Company's financial reports for the third quarter of 2014 due to concerns related to the accounting effects of the bribery scheme involving Petrobras.  In response to this partial disclosure of the true state of the accuracy of Petrobras' financial statements and its deficient internal controls, numerous securities issued by Petrobras, PifCo, and PGF declined in value.

For example, the Company's common stock ADS price fell $0.36 per ADS that day and a further $0.25 per ADS on November 14, a two-day decline of 5.78 percent, to close at $9.95 per ADS. Similarly, the 5.625% note issued by PGF due in 2043 declined in value by $69.650 per $1000, or 7.93 percent, to close the November 14 trading session at $808.72 per $1000 par value.

21.     Three days later, on November 17, 2014, Petrobras hosted a conference call for analysts and investors. During that call, the Company acknowledged that it faced the risk of asset write-downs where asset values had been inflated by corruption. In reaction to this disclosure that the effects of the long-running corruption scheme extended to the Company's financial statements, the value of certain securities of Petrobras, PifCo, and PGF fell. For example, Petrobras' common stock ADS price fell $0.62 per share, or 6.23 percent, to close at $9.33 per ADS. Other Petrobras securities suffered material price declines as well that day.

22.     Finally, on November 24, 2014, prior to the trading session, Petrobras issued a press release announcing that the Company had received a subpoena from the SEC on November 21, 2014, and confirmed that Petrobras was under investigation by the SEC. In reaction to Petrobras' admission that the Company was under investigation relating to material weaknesses in its internal controls, the valuation of the Company's assets, and as a result, the Company's periodic reported expenses and net income, the market value of certain securities of Petrobras and PGF fell. For example, the Company's common and preferred ADS prices fell $0.34 and $0.38 per ADS, respectively, or 3.14 and 3.32 percent, to close at $10.50 and $11.06 per ADS.

23.     As a result of Defendants' materially false and/or misleading statements and omissions: (1) the Notes were offered at artificially inflated prices; and (2) Petrobras, PifCo, and PGF's securities traded at artificially inflated prices during the Class Period. However, when the truth about Petrobras' asset values, expenses, net income, and material weaknesses in its internal

controls became known to investors, the artificial inflation came out, and the price of Petrobras, PifCo, and PGF's securities fell. These price declines caused significant losses and damages to Plaintiff and other members of the Class.

## III.    JURISDICTION AND VENUE

24.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

26.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on an exchange located in this District, and certain of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District. Furthermore, of the 36 debt securities currently outstanding issued by PifCo or PGF, 23 are registered with an exchange located in this District, and of the 28 debt securities issued by PifCo or PGF during the Class Period, 19 (including the reopening of two prior issues) are registered with an exchange located in this District. Moreover, the Company conducted the registered public offerings of all securities at issue in this Action in this District. Additionally, a number of the Underwriter Defendants (as defined herein) maintain their principal places of business in this District.

27.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**IV.   CLASS ACTION ALLEGATIONS**

28.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Petrobras, PifCo, and PGF securities during the Class Period on the NYSE or pursuant to other domestic transactions. Excluded from the Class are Defendants and their families, directors and officers of Petrobras, PifCo, and PGF and their families, and affiliates.

29.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of March 31, 2014, Petrobras had more than 134 million common-share ADSs and more than 100 million preferred-share ADSs outstanding, held by thousands of individuals.

30.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Securities Act was violated by certain Defendants;

(b)     whether the Exchange Act was violated by certain Defendants;

(c)     whether Defendants omitted and/or misrepresented material facts;

(d)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)      whether certain Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)      whether the prices of Petrobras, PifCo, and PGF securities were artificially inflated; and

(g)      the extent of damage sustained by Class members and the appropriate measure of damages.

31.      Plaintiff's claims are typical of those of the Class because Plaintiff and the members of the Class sustained damages from Defendants' wrongful conduct.

32.      Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

33.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## V.      **RELEVANT BACKGROUND**

34.      Petrobras was founded in 1953 as the corporate vehicle for the Brazilian federal government to conduct its crude oil and natural gas import, export, production, and refining activities.  The Company has since grown to become an integrated oil and gas company with operations in all stages of the petroleum production process, including exploration and marketing.

35.      For decades after its founding, Petrobras was wholly owned by the Brazilian government and focused primarily on managing the supply of foreign petroleum for Brazil, negotiating and overseeing oil imports.  In 1990, Brazil instituted a series of economic reforms that included the sale of government holdings in certain industries.

- 11 -

36.     Soon thereafter, Petrobras began to expand its operations, establishing joint-venture subsidiaries in Argentina, Venezuela, and Mexico.  During this period, Brazil set a goal of eventually becoming energy self-sufficient based in part on the projected success of Petrobras in its efforts to expand domestic petroleum exploration, production, and refining.  Petrobras is presently the largest corporation in Brazil, and its operations account for more than 90 percent of Brazil's production of oil.

37.     Petrobras' common equity was first offered for sale to the public in August 2000 and was followed by a sale of preferred shares to the public in July 2001.  The Company's common and preferred equity are listed on the BM&F Bovespa Exchange in São Paulo, Brazil (the "Bovespa") and trade under the ticker symbols "PETR3" and "PETR4," respectively.  Since that time, Petrobras has also sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.

38.     These NYSE-listed ADSs represent a substantial portion of the average daily trading volume for Petrobras equity, including a significant majority of the volume for the Company's common equity.  For example, over the six-month period ending December 22, 2014, the daily average of NYSE-based trade volume of Petrobras' common stock ADS was 76.9 million shares, or 77.96 percent of all volume for the Company's common equity, compared to a daily average of Bovespa-based trade volume of 21.0 million shares, or 21.27 percent of all volume.  The daily average of NYSE-based trade volume of Petrobras' preferred stock ADS over the same period was 30.5 million shares, representing 34.80 percent of all trade volume in the Company's preferred equity.

## VI.   SECURITIES ACT CLAIMS

### A.   Parties

#### 1.   Plaintiff

39.     Plaintiff Providence is a municipal corporation with its principal address at

444 Westminster Street, Suite 220, Providence, Rhode Island.  Providence manages hundreds of

millions of dollars in assets on behalf of thousands of beneficiaries associated with the City of

Providence, including active and retired public employees and their dependents.  As set forth in

the attached certification, Providence purchased Petrobras securities pursuant or traceable to the

Offering Documents and has been damaged thereby.

#### 2.   Securities Act Defendants

##### (a)   The Company

40.     Defendant Petrobras is a corporation organized under the laws of Brazil, and

maintains its principal executive offices at Avenida República do Chile, No. 65, 23rd Floor,

20031-912, Rio de Janeiro, Brazil.  Petrobras also maintains an office at 570 Lexington Avenue,

43rd Floor, New York, New York 10022.  The Company's common and preferred shares are listed

on the Bovespa, trading under the ticker symbols "PETR3" and "PETR4," respectively.  Since

2001, Petrobras has sponsored ADSs representing the Company's common and preferred equity

that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.

Furthermore, of the 36 debt securities currently outstanding issued by PifCo or PGF, 23 are

registered with an exchange located in this District and of the 28 debt securities issued by PifCo

or PGF during the Class Period, 19—including all securities at issue in this action—are registered

with an exchange located in this District.

41.     Defendant PGF is a wholly-owned finance-related subsidiary of Petrobras

incorporated in the Netherlands.  PGF maintains its principal executive offices at Weenapoint

Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.  On February 12, 2014, PGF

acquired the outstanding shares of PifCo, a wholly-owned subsidiary of Petrobras.  Between the

beginning of the Class Period and August 9, 2013, PifCo was organized under the laws of the

Cayman Islands with its principal executive offices at 4th Floor, Harbour Place, 103 South

Church Street, P.O. Box 1034GT – BWI, George Town, Grand Cayman, Cayman Islands.  On

August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with

principal executive offices at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013,

certain assets and liabilities of PifCo were spun off and subsequently merged into Petrobras.  The

publicly issued debt of PGF and PifCo is unconditionally guaranteed by Petrobras, and certain

issues of this debt are registered with the NYSE.

### (b)  The Officer and Director Defendants

42.     Defendant Maria das Graças Silva Foster ("Foster") has served as Chief Executive

Officer ("CEO") of Petrobras since February 13, 2012.  Previously, CEO Foster served as the

Company's Director of Gas and Energy.  CEO Foster signed the prospectus included in the 2012

Registration Statement pursuant to which the Company offered the 2013 Notes and the 2014

Notes.

43.     Defendant Almir Guilherme Barbassa ("Barbassa") has served as Chief Financial

Officer ("CFO") of Petrobras since 2005.  CFO Barbassa signed the prospectuses included in the

2009 Registration Statement and the 2012 Registration Statement pursuant to which the

Company offered the Notes.

44.     Defendant Josué Christiano Gomes da Silva served as a Director of Petrobras, and

signed the prospectus included in the 2009 Registration Statement pursuant to which the

Company offered the 2012 Notes.

45.     Defendant Daniel Lima de Oliveira served as CEO and Chairman of PifCo, and signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

46.     Defendant José Raimundo Brandão Pereira served as a Director of PifCo, and signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

47.     Defendant Sérvio Túlio da Rosa Tinoco served as CFO of PifCo, and signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

48.     Defendant Paulo José Alves served as the Chief Accounting Officer of PifCo, and signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and the 2014 Notes.

49.     Defendant Mariângela Monteiro Tizatto served as the Chief Accounting Officer of PifCo, and signed the prospectus included in the 2009 Registration Statement pursuant to which the Company offered the 2012 Notes.

50.     Defendant Gustavo Tardin Barbosa served as CEO and Managing Director A of PGF, and signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 and 2014 Notes.

51.     Defendant Alexandre Quintão Fernandes served as CFO and Managing Director B of PGF, and signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and 2014 Notes.

52.     Defendant Marcos Antonio Zacarias served as Managing Director A of PGF, and signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and 2014 Notes.

53.     Defendant Cornelis Franciscus Jozef Looman served as Managing Director B of PGF, and signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and 2014 Notes.

54.     Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for PifCo. Helms signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

55.     The Defendants listed in paragraphs 42 to 54 are referred to as the "Officer and Director Defendants."

**(c)     The Underwriter Defendants**

56.     Defendant BB Securities Ltd. ("BB Securities") acted as an underwriter and joint bookrunner of the Notes offerings. BB Securities is a subsidiary of Banco do Brasil S.A. incorporated in the United Kingdom with its principal place of business at Pinners Hall, 105–108 Old Broad Street, London, EC2N 1ER, United Kingdom. Banco do Brasil S.A. maintains an office at 535 Madison Avenue, 34th Floor, New York, New York 10022.

57.     Defendant Citigroup Global Markets Inc. ("Citigroup") acted as an underwriter and joint bookrunner of the Notes offerings. Citigroup maintains its principal place of business at 388 Greenwich Street, New York, New York 10013.

58.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as an underwriter and joint bookrunner of the Notes offerings. J.P. Morgan maintains its principal place of business at 277 Park Avenue, New York, New York 10172.

59.     Defendant Itaú BBA USA Securities, Inc. ("Itaú") acted as an underwriter and joint bookrunner of the offerings of the 2012 Notes and 2013 Notes. Itaú maintains its principal place of business at 767 Fifth Avenue, 50th Floor, New York, New York 10153.

60.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter and joint bookrunner of the offerings of the 2012 Notes and 2013 Notes. Morgan Stanley maintains its principal place of business at 1585 Broadway, New York, New York 10036.

61.     Defendant Santander Investment Securities Inc. ("Santander") acted as an underwriter and joint bookrunner of the offering of the 2012 Notes. Santander is a subsidiary of Santander S.A., which has its principal place of business at Santander Group City, Av. de Cantabria s/n, 28660 Boadilla del Monte, Madrid, Spain, and maintains an office at 45 East 53rd Street, New York, New York 10022.

62.     Defendant HSBC Securities (USA) Inc. ("HSBC") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes and 2014 Notes. HSBC maintains its principal place of business at 354 Sixth Avenue, New York, New York 10011.

63.     Defendant Banco Votorantim Nassau Branch ("Banco Votorantim") acted as an underwriter and co-manager of the offering of the 2012 Notes. Banco Votorantim maintains an office at Saffrey Square Building, Suite 204 Bay Street Bank Lane, Nassau, Bahamas. Banco Votorantim is a subsidiary of Banco Votorantim S.A., which has its principal place of business at Av. das Nações Unidas 14171, Torre a, 18° andar, Vila Gertrudes, São Paulo, Brazil, and maintains an office at 126 East 56th Street, New York, New York 10022.

64.     Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") acted as an underwriter and co-manager of the offerings of the 2012 Notes and 2013 Notes. Mitsubishi maintains an office at 1633 Broadway, 29th floor, New York, New York 10019.

65.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter and joint bookrunner of the 2013 Notes offering. Merrill Lynch maintains its principal place of business at One Bryant Park, New York, New York 10036.

66.     Defendant Standard Chartered Bank ("Standard Chartered") acted as an underwriter and co-manager of the 2013 Notes offering. Standard Chartered maintains its principal place of business at Two Gateway Center 13th Floor, Newark, New Jersey 07102.

67.     Defendant Bank of China (Hong Kong) Limited ("Bank of China") acted as an underwriter and joint bookrunner of the 2014 Notes offering. Bank of China maintains its principal place of business at Bank of China Tower, 1 Garden Road, Hong Kong.

68.     Defendant Banco Bradesco BBI S.A. ("Bradesco") acted as an underwriter and joint bookrunner of the 2014 Notes offering. Bradesco has its principal place of business at Avenida Paulista, 1450 8th Floor, Sao Paulo, Brazil, and maintains an office at 450 Park Avenue, New York, New York 10022.

69.     Defendant Banca IMI S.p.A. ("Banca IMI") acted as an underwriter and co-manager of the 2014 Notes offering. Banca IMI has its principal place of business at Largo Mattioli, 3 Milan, MI 20121, Italy, and through its subsidiary Banca IMI Securities Corporation maintains an office at 1 William Street, New York, New York 10004.

70.     Defendant Scotia Capital (USA) Inc. ("Scotia Capital") acted as an underwriter and co-manager of the 2014 Notes offering. Scotia Capital maintains its principal place of business at 1 Liberty Plaza, 165 Broadway, 25th Floor, New York, New York 10006.

71.     The Defendants listed in paragraphs 56 to 70 are referred to as the "Underwriter Defendants." Petrobras, PGF, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

(d)     <u>Relevant Non-defendant Individuals</u>

72.     Dilma Vana Rousseff ("President Rousseff") currently serves as President of Brazil. President Rousseff served as the Chair of the Board of Directors of Petrobras prior to March 2010, and signed the prospectus included in the 2009 Registration Statement pursuant to which the Company offered the 2012 Notes.

73.     Guido Mantega ("Minister Mantega") currently serves as the Minister of Finance of Brazil and as the Chair of the Board of Directors of Petrobras. Minister Mantega signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and the 2014 Notes.

74.     José Sergio Gabrielli de Azevedo ("Gabrielli") currently serves as the Secretary of Planning for the State of Bahia, Brazil. Gabrielli served as CEO and member of the Company's Board of Directors (the "Board") for Petrobras prior to February 13, 2012. CEO Gabrielli signed the prospectus included in the 2009 Registration Statement pursuant to which the Company offered the 2012 Notes.

75.     Silas Rondeau Cavalcante Silva served as Brazil's Minister of Mines and Energy between 2005 and 2007, and as a Director of Petrobras. Silas Rondeau Cavalcante Silva signed the prospectus included in the 2009 Registration Statement pursuant to which the Company offered the 2012 Notes.

76.     Fabio Colletti Barbosa served as a member of the Council for Economic and Social Development and as a Director of Petrobras. Fabio Colletti Barbosa signed the prospectus included in the 2009 Registration Statement pursuant to which the Company offered the 2012 Notes.

77.     Marcos Antônio Silva Menezes served as a member of the fiscal council of Instituto Brasileiro de Petroleo, Gas e Biocombustiveis, as Chief Accounting Officer for

Petrobras, and as a Director of PifCo.  Marcos Antônio Silva Menezes and signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

78.     Francisco Roberto de Albuquerque serves as a commanding officer in the Army of Brazil and as a Director of Petrobras.  Francisco Roberto de Albuquerque signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

79.     Jorge Gerdau Johannpeter served as the chair of the Chamber of Management Policies, Performance and Competitiveness and as a Director of Petrobras.  Jorge Gerdau Johannpeter signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

80.     Luciano Galvão Coutinho served Executive Secretary of the Science & Technology Ministry of Brazil and as a Director of Petrobras.  Luciano Galvão Coutinho signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

81.     Sergio Franklin Quintella served the President of the Federal Tribunal Court and as a Director of Petrobras.  Sergio Franklin Quintella signed the prospectuses included in the 2009 Registration Statement and the 2012 Registration Statement pursuant to which the Company offered the Notes.

82.     Márcio Pereira Zimmermann serves as Deputy Minister of Energy and as a Director of Petrobras. Márcio Pereira Zimmermann signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and the 2014 Notes.

83.    Miriam Aparecida Belchior serves as Minister of Planning and as a Director of Petrobras.  Miriam Aparecida Belchior signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and the 2014 Notes.

**B.    Claims Against the Securities Act Defendants**

84.    On December 11, 2009, Petrobras and PifCo filed a registration statement on Form F-3ASR for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities (the "2009 Registration Statement").  The 2009 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2008, filed with the SEC on May 22, 2009.

85.    This Form 20-F set forth the value of the Company's "[p]roperty, plant and equipment, net" as of December 31, 2008 as $85 billion and its total assets as $126 billion.  The Form 20-F also stated that Petrobras' depreciation, depletion, and amortization expenses were $5.9 billion and its net income was $18.9 billion for 2008.  The 2009 Registration Statement also incorporated, among other documents, "[a]ny future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

86.    On February 3, 2012, PifCo filed a prospectus supplement on Form 424B2 for the offer and sale of $7 billion in debt securities pursuant to the 2009 Registration Statement (the "2012 Prospectus" and together with the 2009 Registration Statement, the "2012 Offering Documents").

87.    The 2012 Offering Documents offered the 2012 Notes, which included four series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 to be sold at $1041.81 per $1000 par value; (2) a $1.25 billion re-opening of notes

first offered on January 27, 2011 paying 6.750% due in 2041 to be sold at $1112.08 per $1000 par value; (3) $1.25 billion of notes paying 2.875% due in 2015 to be sold at $994.99 per $1000 par value; and (4) $1.75 billion of notes paying 3.500% due in 2017 to be sold at $994.19 per $1000 par value.

88.     The 2012 Offering Documents incorporated by reference, among other documents, the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2010, filed with the SEC on May 26, 2011, which included descriptions of Petrobras, its asset values, expenses, net income, and its internal controls. For example, this Annual Report reported total assets of $309 billion including net property, plant, and equipment of $219 billion, total costs and expenses of $96 billion including depreciation, depletion, and amortization of $8.5 billion, and net income of $19.2 billion. It also reported that the Company's internal controls did not suffer from material weaknesses.

89.     On August 29, 2012, Petrobras, PifCo, and PGF filed a registration statement on Form F-3ASR for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities (the "2012 Registration Statement"). The 2012 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011, filed with the SEC on March 30, 2012, and its amendment on Form 20-F/A, filed with the SEC on July 9, 2012.

90.     This incorporated Form 20-F set forth the value of the Company's "[p]roperty, plant and equipment, net" as of December 31, 2011 as $182 billion and its total assets as $319 billion. The Form 20-F also stated that Petrobras' depreciation, depletion, and amortization expenses were $10.5 billion and its net income was $20.0 billion for 2011. The 2012 Registration

Statement also incorporated, among other documents, "[a]ny future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

91.     On May 13, 2013, Petrobras issued a press release announcing the pricing of the 2013 Notes, $11 billion in debt securities to be issued by PGF.  On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes pursuant to the 2012 Registration Statement (the "2013 Prospectus" and together with the 2012 Registration Statement, the "2013 Offering Documents").

92.     The 2013 Offering Documents offered the 2013 Notes, which included six series of notes: (1) $1.25 billion of notes paying 2.00% due in 2016 to be sold at $995.84 per $1000 par value; (2) $2 billion of notes paying 3.00% due in 2019 to be sold at $993.52 per $1000 par value; (3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per $1000 par value; (4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1000 par value; (5) $1 billion of floating-rate notes due in 2016 to be sold at par; and (6) $1.5 billion of floating-rate notes due 2019 to be sold at par.

93.     The 2013 Offering Documents incorporated by reference, among other documents, the Company's Annual Report on Form 20-F for the year ended December 31, 2012, filed with the SEC on April 29, 2013, which included descriptions of Petrobras, its asset values, expenses, net income, and its internal controls.  For example, the incorporated Annual Report on Form 20-F stated that Petrobras held assets valued at $332 billion, including property, plant, and equipment valued at $205 billion as of December 31, 2012.  It also reported that the Company's internal controls did not suffer from material weaknesses.

94.    On March 10, 2014, Petrobras issued a press release announcing the pricing of the

2014 Notes, $8.5 billion in debt securities to be issued by PGF.  On March 11, 2014, PGF filed a

prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes pursuant to the

2012 Registration Statement (the "2014 Prospectus" and together with the 2012 Registration

Statement, the "2014 Offering Documents").

95.    The 2014 Offering Documents offered the 2014 Notes, which included six series

of notes: (1) $1.6 billion of notes paying 3.250% due in 2017 to be sold at $999.57 per $1000 par

value; (2) $1.5 billion of notes paying 4.875% due in 2020 to be sold at $997.43 per $1000 par

value; (3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1000 par

value; (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66 per $1000 par

value; (5) $1 billion of floating-rate notes due in 2017 to be sold at par; and (6) $500 million of

floating-rate notes due 2020 to be sold at par.

96.    The 2014 Offering Documents incorporated by reference, among other documents,

the Company's Annual Report on Form 20-F for the year ended December 31, 2012, filed with

the SEC on April 29, 2013.  The 2014 Offering Documents also incorporated the Company's

Report furnished on March 7, 2014 containing management's report on internal control over

financial reporting, which stated in relevant part:

> Our management has assessed the effectiveness of our internal
> control over financial reporting as of December 31, 2013, based on
> the criteria established in Internal Control—Integrated Framework
> (1992) issued by the Committee of Sponsoring Organizations of
> the Treadway Commission (COSO).  ***Based on such assessment
> and criteria, the Company's management has concluded that
> Company's internal control over financial reporting was effective
> as of December 31, 2013***.

97.    However, the descriptions of Petrobras' asset values, expenses, net income, and the

assertions that the Company did not suffer from material weaknesses in internal controls set forth

in the 2012 Offering Documents, 2013 Offering Documents, and 2014 Offering Documents
(collectively, the "Offering Documents") were materially false and misleading because:
(1) Petrobras did suffer from material weaknesses in internal controls; (2) the claimed value of the
Company's assets was materially overstated due to the improper inclusion of repayments of
bribery-related amounts to construction contractors and others in the recorded values of certain
assets; and, as a result, (3) the stated amounts of the Company's periodic expenses and net income
were false and misleading.

98.     The Securities Act Defendants owed Plaintiff and the Class a duty to make a
reasonable and diligent investigation of the statements contained in the Offering Documents to
ensure that the statements contained or incorporated by reference therein were true and that there
was no omission to state a material fact required to be stated therein or necessary to make the
statements therein not misleading.

99.     The Securities Act Defendants did not make a reasonable and diligent
investigation of the statements contained in or incorporated by reference into the Offering
Documents and did not possess reasonable grounds for believing that the Offering Documents
did not contain an untrue statement of material fact or omit to state a material fact required to be
stated therein or necessary to make the statements therein not misleading.

100.    On or about March 17, 2014, the DPF launched operation Car Wash, focused on a
scheme run by black-market money dealers who are thought to have illegally transferred and
laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury
automobiles.

101.    On or about March 20, 2014, the federal police force of Brazil arrested Paulo
Costa, a former senior executive of Petrobras in connection with Operation Car Wash based on

documentation linking Costa to the receipt of a luxury automobile from another individual implicated in the money laundering scheme.

102.   The falsity of the Offering Documents was revealed in part during the trading session on November 13, 2014, when Petrobras issued a press release stating that the Company would not file its third quarter 2014 financial statements accompanied by a review report of PwC in a timely manner, disclosing in relevant part:

> [A]s a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) make any **adjustments to the financial statements based on the accusations and investigations related to the "Lava Jato Operation"** and (iii) evaluate the **need for internal controls improvements**, Petrobras is unable to release its third quarter 2014 financial statements at this time.

As the securities markets digested these revelations, the market value of the Notes declined sharply during the end of the trading session on November 13 and the trading session on November 14, 2014.  For example, the 5.625% note due in 2043 offered among the 2013 Notes declined in value by $69.650 per $1000, or 7.93 percent, over that period for a loss of market value of more than $138 million, to close the trading session on November 14, 2014 at $808.72 per $1000 par value.

103.   The inaccuracies in the Offering Documents were further disclosed on November 17, 2014, when, prior to the commencement of the trading session, the Company hosted a conference call for analysts and investors to discuss Petrobras' operations in the third quarter of 2014 and the effects of the revelations of bribery.  During the conference call, CFO Barbassa engaged, in relevant part, in the following interpreted exchange:

> **[Analyst]:**  [W]e need to understand how this can possibly impact the financial statements of the Company in the third quarter or the fourth quarter.  So if we suppose, as I say, BRL5 billion of overprice in the construction of Rnest, **how would this be recognized in the balance sheet of the Company**?

> **CFO Barbassa:** The adjustment that perhaps could be impacted if the accusations are proven to be true would refer to ***adjustments at fair price of the PP&E that was acquired.*** . . . In this case, ***this value should be removed from PP&E line item*** [adjusted] value.

In reaction to these disclosures regarding Petrobras' previously reported asset values, the market value of numerous Notes declined sharply during the trading session that day. For example, the 4.375% note due in 2023 issued among the 2013 Notes fell $9.16 per $1000, or more than $35.8 million in market value, to close the day's trading session at $887.03 per $1000 par value.

104.    Plaintiff and the other members of the Class purchased or acquired the Notes pursuant and/or traceable to the Offerings and were damaged thereby.

105.    Plaintiff and the other members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts and/or omissions of material facts in the Offering Documents when they purchased or acquired the Notes.

### C.    Counts Against Securities Act Defendants Related to the Offerings

### COUNT I

#### For Violations of Section 11 of the Securities Act
#### Against the Securities Act Defendants

106.    Plaintiff repeats and realleges paragraphs 1 to 105, as if fully set forth herein, except that for purposes of Counts I, II, and III, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

107.    This Count is brought against the Securities Act Defendants on behalf of those members of the Class who purchased or otherwise acquired Notes pursuant or traceable to the Offerings. The Offering Documents for the Offerings were false and misleading, contained

untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to adequately disclose material facts, as set forth above.

108.   The Securities Act Defendants are strictly liable for the misstatements and omissions and for the damages that Plaintiff and the other members of the Class have sustained thereby.  The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

109.   The Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct herein alleged, each of the Securities Act Defendants violated and/or controlled a person who violated, Section 11 of the Securities Act.

110.   Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

111.   Plaintiff repeats and realleges paragraphs 1 to 110, as if fully set forth herein, except that for purposes of Counts I, II, and III, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as

these counts are based solely on claims of strict liability and/or negligence under the Securities Act. This Count is brought against the Underwriter Defendants on behalf of all persons or entities who purchased the Notes pursuant to the Offerings.

112.    The Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the Notes pursuant to the Offering Documents. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts. The Underwriter Defendants' actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

113.    The Underwriter Defendants owed a duty to the purchasers of the Notes, including Plaintiff and the other members of the Class, to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

114.    Plaintiff and other members of the Class purchased the Notes from the Underwriter Defendants pursuant to the defective Offering Documents. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the false nature of the statements and omissions contained in the Offering Documents.

115.    By reason of the conduct alleged herein, the Underwriter Defendants violated and/or controlled persons who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and the other members of the Class who hold the Notes purchased in or traceable to the

Offerings have the right to rescind their purchases of and recover the consideration paid for their Notes.

116.   Plaintiff, individually and representatively, hereby offers to tender to the Underwriter Defendants any Notes that Plaintiff and the other members of the Class continue to own, on behalf of all members of the Class who continue to own such Notes, in return for the consideration paid for those Notes, together with interest thereon. Plaintiff, individually and representatively on behalf of Class members who have sold their Notes, is entitled to and hereby claims rescission damages.

117.   Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT III

### For Violations of Section 15 of the Securities Act
### Against the Officer and Director Defendants

118.   Plaintiff repeats and realleges paragraphs 1 to 117, as if fully set forth herein, except that for purposes of Counts I, II, and III, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

119.   This Claim is brought against the Officer and Director Defendants pursuant to Section 15 of the Securities Act on behalf of all persons or entities who purchased the Notes pursuant or traceable to the Offerings conducted pursuant to the Offering Documents.

120.    As set forth in Count I herein, Petrobras and PGF are liable pursuant to Section 11 of the Securities Act.  Each of the Officer and Director Defendants was a control person of Petrobras, PifCo, and/or PGF with respect to the Offerings by virtue of such individual's position as a senior executive officer and/or director of Petrobras, PifCo, and/or PGF and had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of Petrobras, PifCo, and/or PGF.  By reason of their positions within Petrobras, PifCo, and/or PGF, and/or positions on the board of directors of Petrobras, PifCo, and/or PGF, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I.

121.    Each of the Officer and Director Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed one or more of the Offering Documents and having otherwise participated in the process that allowed the Offerings to be executed.  The Officer and Director Defendants, by virtue of their managerial and/or board positions with Petrobras, PifCo, and/or PGF, controlled Petrobras, PifCo, and/or PGF, as well as the contents of the Offering Documents, at the time of the Offerings.  Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

122.    As a result, the Officer and Director Defendants are liable pursuant to Section 15 of the Securities Act for the primary violations of Section 11 of the Securities Act by Petrobras, PifCo, and PGF.

123.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Notes pursuant or traceable to the Offerings are entitled to damages against the Officer and Director Defendants.

124.    Less than one year has elapsed between the time Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## VII.   EXCHANGE ACT CLAIMS

### A.    Parties

#### 1.    Plaintiff

125.    Plaintiff Providence is a municipal corporation with its principal address at 444 Westminster Street, Suite 220, Providence, Rhode Island.  Providence manages hundreds of millions of dollars in assets on behalf of thousands of beneficiaries associated with the City of Providence, including active and retired public employees and their dependents.  As set forth in the attached certification, Providence purchased Petrobras securities at artificially inflated prices during the Class Period and has been damaged thereby.

#### 2.    Exchange Act Defendants

##### (a)    The Company

126.    Defendant Petrobras is described above in paragraph 34.  The Company's common and preferred shares are listed on the Bovespa, trading under the ticker symbols "PETR3" and "PETR4," respectively.  Since 2001, Petrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.  These ADSs represent a substantial portion of the average

daily trading volume for Petrobras equity, including a significant majority of the volume for the Company's common equity. For example, over the six-month period ending December 22, 2014, the daily average of NYSE-based trade volume of Petrobras' common stock ADS was 76.9 million shares, or 77.96 percent of all volume for the Company's common equity, compared to a daily average of Bovespa-based trade volume of 21.0 million shares, or 21.27 percent of all volume. The daily average of NYSE-based trade volume of Petrobras' preferred stock ADS over the same period was 30.5 million shares, representing 34.80 percent of all trade volume in the Company's preferred equity. Additionally, of the 36 debt securities currently outstanding issued by PifCo or PGF, 23—representing more than $42.6 billion of principal value—are registered with an exchange located in this District, and of the 28 debt securities issued by PifCo or PGF during the Class Period, 19 (including the reopening of two prior issues) are registered with an exchange located in this District.

127.    A description of Defendant PGF is set forth above in paragraph 41.

**(b)    The Individual Defendants**

128.    Defendant Foster has served as CEO of Petrobras since February 13, 2012. Previously, CEO Foster served as the Company's Director of Gas and Energy. During the Class Period, CEO Foster certified certain of the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

129.    Defendant Barbassa served as CFO of Petrobras during the Class Period, certifying the Company's periodic financial reports filed with the SEC and communicating with investors, participating in the Company's periodic conference calls.

130.    Defendants described in paragraphs 128 and 129 are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with Defendants Petrobras and PGF, are collectively referred to herein as the "Exchange Act Defendants."

(c)      Relevant Non-defendant Individual

131.     Defendant Gabrielli served as CEO and member of the Company's Board for Petrobras during the Class Period prior to February 13, 2012.  During the Class Period, CEO Gabrielli certified certain of the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

B.      Claims Against the Exchange Act Defendants

132.     Prior to the start of the Class Period, on December 11, 2009, Petrobras and PifCo filed a registration statement on Form F-3ASR for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities (the "2009 Registration Statement").  The 2009 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2008, filed with the SEC on May 22, 2009 (the "2008 Form 20-F").

133.     The 2008 Form 20-F set forth the value of the Company's "[p]roperty, plant and equipment, net" as of December 31, 2008 as $84.719 billion and its total assets as $125.695 billion.  The Form 20-F also stated that Petrobras' depreciation, depletion, and amortization expenses were $5.928 billion and its net income was $18.879 billion for 2008.

134.     The Company' 2008 Form 20-F included a certification signed by CEO Gabrielli, incorporated therein as Exhibit 12.1, which stated:

> I, José Sérgio Gabrielli de Azevedo, certify that:
>
> 1.  I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. — PETROBRAS (the "Company");
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.   The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting;

5.   The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

A substantially identical certification, signed by CFO Barbassa, was also included as part of Exhibit 12.1.

135.   Substantially identical certifications, signed by PifCo CEO Daniel Lima de Oliveira and PifCo CFO Servio Tulio da Rosa Tinoco, were included as Exhibit 12.2.

136.   The 2009 Registration Statement also incorporated, among other documents, "[a]ny future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

### 1.   Materially False and Misleading Statements During the Class Period

137.   On January 22, 2010, Petrobras issued a press release setting forth certain descriptions of investment agreements entered into by the Company, Odebrecht S.A. ("Odebrecht") and Braskem S.A. ("Braskem"), including, among other things, a partnership agreement relating to their commercial and corporate relationship with COMPERJ. This press release stated in relevant part:

> Petrobras, Odebrecht and Braskem also entered into a partnership agreement ("Partnership Agreement") to regulate their commercial and corporate relationship with [COMPERJ] and with the Suape Petrochemical Complex ("Suape Complex").   Under the Partnership Agreement, Braskem will take on the companies operating COMPERJ's petrochemical first and second generation, as well as, gradually acquire equity interests in companies operating in the Suape Complex, in accordance with the terms and conditions agreed in the Association Agreement.

> The transaction is in line with Petrobras' 2009-2013 Business Plan, which foresees investments in the order of $5.6 billion to the petrochemical segment aiming to operate in the industry in an integrated manner and adding value to the crude oil produced. However, it considers a new model of investments in this segment but in line with the Company's objectives to approve long-term sustainable investments that offer high returns to its shareholders.

138.    On March 24, 2010, the Company issued a press release announcing its results of operations for the full year of 2009.  The Company reported total assets of $200 billion including net property, plant, and equipment of $136 billion, total costs and expenses of $70 billion including depreciation, depletion, and amortization of $7.1 billion, and net income of $15.5 billion.

139.    That day, Petrobras hosted a conference call for investors and analysts to discuss these results.  As part of his prepared remarks, CEO Gabrielli stated in part:

> In downstream—*in downstream, we invested in 2009 BRL17.3 billion*.  Most of the investment was—34% was in fuel quality, which is that we are increasing our capacity for reducing sulfur emission in our gasoline and diesel, trying to meet the environmental requirements of Brazil.
>
> *       *       *
>
> Also, we had a very important cost reduction efforts.  We operate in several areas.  *We changed our bidding process.  We divide the packages and different suppliers in such a way that we could get more competitive bids.*  We standardized more of our purchase.

Later, CEO Gabrielli took part, in relevant part, in the following exchange:

> [Analyst]:  [O]n the refining CapEx, *I'd like to understand why, for instance, the Abreu e Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the US or Europe.*  I might be missing something, so I just wanted to understand.  It may be related to infrastructure or something else.  And maybe even the [Modern Young] and Cera refineries seem to be a bit higher in terms of costs versus the international benchmark.

> **CEO Gabrielli:** We haven't finished the numbers. If you have the numbers, well, please tell me, because we don't finish it. We don't have them.

> **[Analyst]:** We got the numbers from [one of local Pested] and from (inaudible) reports from the PCU indicator.

> **CEO Gabrielli:** Okay. if you have them, that's another thing. But we are finishing the numbers and for sure, that's something that we have to take into consideration, our qualitative base. For example, for example, most of the assessment of the cost of refinance is a kind of plug and play refinery in which you go produce the refinery, and plug to the infrastructure and that's it. It is not our case.

140.    On May 20, 2010, Petrobras and PifCo filed an Annual Report on Form 20-F for 2009 setting forth substantially similar figures as those set forth in the Company's earlier press release. The Form 20-F also included certifications substantially similar to those described in paragraphs 134 and 135.

141.    On May 27, 2010, Petrobras issued a press release announcing its results of operations for the first quarter of 2010. The Company reported total assets of $204 billion including net property, plant, and equipment of $141 billion, total costs and expenses of $21.3 billion including depreciation, depletion, and amortization of $2.0 billion, and net income of $4.3 billion.

142.    In connection with these results, CEO Gabrielli stated:

> We are going through a period of crucial importance regarding our shareholders. During the next few months we are planning an important capitalization that will prepare Petrobras to go ahead with the investments needed for its integrated growth and the development of new frontiers. *We are fully committed to implementing a fair and transparent operation, respecting our minority shareholders' rights and following the best practices of corporate governance.*

> \*       \*       \*

> Our priority is to grow in an integrated manner and with
> profitability.  In order to do so, we rely on a strong business
> foundation that ensures a substantial cash flow.  *We also have*
> *access to several sources of financings, either through banks or*
> *the capital markets, which give us the financial muscle to sustain*
> *our expansion* and allow us to grow, invest and maintain an
> appropriate capital structure.  *Our growth is underpinned by the*
> *absolute certainty that we have one of the best project portfolios*
> *and opportunities in the world, and that we will invest all of our*
> *resources with efficiency and discipline, ensuring returns for our*
> *shareholders, investors and society as a whole.*

143.    On June 21, 2010, Petrobras issued a press release announcing that the Company's

"Board of Directors approved the 2010-2014 Business Plan on June 18th, with investments

totaling $224 billion."  The 2010-2014 Business Plan set forth the projection that Petrobras would

meet the funding requirements for these investments in part by issuing $96 billion in debt and

equity.

144.    On August 24, 2010, Petrobras issued a press release announcing its results of

operations for the second quarter of 2010.  The Company reported total assets of $211 billion

including net property, plant, and equipment of $147 billion, total costs and expenses of

$23.4 billion including depreciation, depletion, and amortization of $2.1 billion, and net income

of $4.2 billion.

145.    In connection with these results, CEO Gabrielli stated:

> We are passing through an exceptional time in our history.  In the
> first six months of 2010, *we invested a record amount of*
> *U.S.$19,387 million, 35,8% more than the same period last year,*
> *primarily allocated to increasing oil and gas production capacity,*
> *modernizing and expanding our refineries and reorganizing our*
> *interests in the petrochemical sector*, particularly in regard to
> Braskem.
>
> This substantial increase in capital expenditures is a reflection of
> the number and quality of projects in our investment portfolio, as
> reflected in the expansion of our strategic business plan.  In June,
> we released the 2010-2014 Business Plan, in which we project

investment spending of U.S.$224 billion, or approximately U.S.$45 billion per year.

146.   On August 25, 2010, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the six-month period ended June 30, 2010 with figures substantially similar to those set forth in the Company's earlier press release.

147.   On September 16, 2010, Petrobras filed Forms F-6 and post-effective amendments thereto registering: (1) 200 million ADSs, each representing two shares of Petrobras common stock; and (2) 500 million ADSs, each representing two shares of Petrobras preferred stock. These registration statements were declared effective on September 17, 2010.

148.   On October 1, 2010, Petrobras issued a press release announcing the closing of the over-allotment of the Company's offering of ADSs representing the Company's common and preferred stock, totaling 65,704,296 preferred shares in the form of ADSs and 75,198,838 common shares in the form of ADSs.

149.   On November 23, 2010, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2010.  The Company reported total assets of $298 billion including net property, plant, and equipment of $206 billion, total costs and expenses of $25.1 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.7 billion.

150.   In connection with these results, CEO Gabrielli stated in part:

> The success of our Global Offering was due to the confidence of our shareholders and investors, the Company's excellent reputation in the capital markets and ***our commitment to transparency*** and investor returns.
>
> *        *        *
>
> Our financial plan is based on maintaining leverage ratios within specified target levels and ***will enable the Company to use the***

> *proceeds of the Global Offering to become stronger and carry out
> its business plan.*

151.    On November 24, 2010, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the nine-month period ending September 30, 2010 with

figures substantially similar to those set forth in the Company's earlier press release.

152.    On January 21, 2011, PifCo filed a prospectus supplement on Form 424B2 for the

sale of $6 billion in debt composed of three series of notes: (1) $2.5 billion of notes paying

3.875% due in 2016 at an initial price to the public of 99.663%; (2) $2.5 billion of notes paying

5.375% due in 2021 at an initial price to the public of 99.801%; and (3) $1 billion of notes paying

6.750% due in 2041 at an initial price to the public of 99.288%.

153.    This Form 424B2 incorporated by reference, among other documents, the 2009

Annual Reports of Petrobras and PifCo, and financial statements and earnings releases for the

Company for the nine-month period ending September 30, 2010.

154.    On January 27, 2011, Petrobras issued a press release announcing that the offering

of the $6 billion of notes pursuant to the Form 424B2 filed on January 21, 2011 had closed.  The

release noted:

> The transaction was the largest-ever corporate bond offering by a
> Brazilian company in the international capital markets, and the
> book was ***oversubscribed 2.5 times with more than 463 investors
> from the United States***, Europe, Asia and Latin America
> participating, most of them dedicated to the high grade market.

> Petrobras will use the proceeds of this multi-tranche offering to
> finance Petrobras' planned capital expenditure under its 2010-2014
> Business Plan ***while maintaining an adequate capital structure
> and staying within Petrobras' targeted financial leverage ratios*** in
> accordance with its 2010-2014 Business Plan.

155.    On March 15, 2011, the Company issued a press release announcing its results of

operations for the fourth quarter and full year of 2010.  For 2010, the Company reported total

assets of $309 billion including net property, plant, and equipment of $219 billion, total costs and expenses of $96 billion including depreciation, depletion, and amortization of $8.5 billion, and net income of $19.2 billion.

156.    In connection with these results, CEO Gabrielli stated in part:

> *Our results* for the fourth quarter and full year of 2010 further underscore our capacity for overcoming challenges, as well as *emphasize[ ]the quality of our assets* and investment projects.
>
> \*        \*        \*
>
> At Petrobras, we are fully aware that our achievements would not have been possible without the adoption of good corporate governance practices, as well as investments in technology and workforce training.

157.    On May 24, 2011, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2011.  The Company reported total assets of $331 billion including net property, plant, and equipment of $230 billion, total costs and expenses of $25.2 billion including depreciation, depletion, and amortization of $2.3 billion, and net income of $6.5 billion.

158.    In connection with these results, CEO Gabrielli stated in part:

> On the corporate front, we undertook the largest ever international debt issuance by a Brazilian company, placing U.S.$6,000 million in bonds maturing in 5, 10 and 30 years.  The proceeds will be used to finance the investments foreseen in our Business Plan, thereby maintaining an appropriate capital structure and financial leverage in line with our objectives.
>
> \*        \*        \*
>
> We achieved the milestones above . . . not only meeting growing demand in these markets, but also *ensuring that all of the Company's human, financial and operational resources are put to the best possible use*.  We remain confident in our capacity to achieve the goals laid out in our Business Plan, thereby ensuring increasing returns for our shareholders and investors.

159.    On May 26, 2011, Petrobras and PifCo filed an Annual Report on Form 20-F for
2010 setting forth substantially similar figures as those set forth in the Company's earlier press
release. The Form 20-F also included certifications substantially similar to those described in
paragraphs 134 and 135.

160.    That same day, the Company filed a Form 6-K with the SEC setting forth the
Company's financial statements for the three-month period ending March 31, 2011 with figures
substantially similar to those set forth in the Company's earlier press release.

161.    On July 22, 2011, Petrobras issued a press release announcing that the Company's
"Board of Directors approved today the 2011-2015 Business Plan, involving total investments of
US$224.7 billion (R$389 billion)." The 2010-2014 Business Plan set forth the projection that
Petrobras would require financing of between $67.0 billion and $91.4 billion.

162.    On August 24, 2011, Petrobras issued a press release announcing the Company's
results of operations for the second quarter of 2011. The Company reported total assets of
$351 billion including net property, plant, and equipment of $247 billion, total costs and
expenses of $31.2 billion including depreciation, depletion, and amortization of $2.5 billion, and
net income of $6.6 billion.

163.    In connection with these results, CEO Gabrielli stated in part:

> Following exhaustive analysis, we approved our 2011-2015
> Business Plan in July, with total investments of U.S.$224.7 billion,
> virtually identical in size to the 2010-2014 Business Plan. The
> plan calls for higher investments in exploration and production
> .... We also intend to divest certain assets, as part of *our ongoing
> determination to make the best possible use of our capital*. We
> have also maintained our commitment not to issue additional
> shares in the period, as well as to *maintaining the investment-
> grade status conferred by the leading ratings agencies*.

164.     On August 25, 2011, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the three-month period ending June 30, 2011 with figures

substantially similar to those set forth in the Company's earlier press release.

165.     On November 22, 2011, Petrobras issued a press release announcing the

Company's results of operations for the third quarter of 2011. The Company reported total assets

of $309 billion including net property, plant, and equipment of $220 billion, total costs and

expenses of $31.5 billion including depreciation, depletion, and amortization of $2.6 billion, and

net income of $3.9 billion.

166.     In connection with these results, CEO Gabrielli stated in part:

> We continue to invest in the expansion of our refineries,
> strengthening our position as an integrated company.

*          *          *

> We improved our performance with respect to economic and social
> criteria and were **granted the highest score in the Transparency
> criterion** for the fifth time.

*          *          *

> Thanks to product and service quality, **a strong commitment to
> sustainable development, state-of-the-art technology and
> exemplary management**, Petrobras continues to strengthen its
> position as a major player in the global oil and gas market and is
> fully prepared for new conquests.

167.     Also on November 22, 2011, Petrobras filed a Form 6-K with the SEC setting forth

the Company's financial statements for the three-month period ending November 30, 2011 with

figures substantially similar to those set forth in the Company's earlier press release.

168.     On January 23, 2012, Petrobras notified the market of possible changes among the

Company's executives. On January 24, 2012, the Company issued a press release confirming the

upcoming nomination of defendant Foster to replace CEO Gabrielli who was reportedly planning to run for public office.

169.    On February 3, 2012, PifCo filed the 2012 Prospectus for the offering of the 2012 Notes. This offering comprised four series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 to be sold at $1041.81 per $1000 par value; (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 2041 to be sold at $1112.08 per $1000 par value; (3) $1.25 billion of notes paying 2.875% due in 2015 to be sold at $994.99 per $1000 par value; and (4) $1.75 billion of notes paying 3.500% due in 2017 to be sold at $994.19 per $1000 par value.

170.    The 2012 Offering Documents incorporated by reference, among other documents, the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2010, filed with the SEC on May 26, 2011, which included descriptions of Petrobras, its asset values, expenses, net income, and its internal controls, as set forth above.

171.    On February 28, 2012, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2011. For 2011, the Company reported total assets of $319 billion including net property, plant, and equipment of $182 billion, depreciation, depletion, and amortization of $10.5 billion, and net income of $20.0 billion.

172.    In connection with these results, CEO Gabrielli stated in part:

> Our results represent the realization of our expectations, and indicate that our sustainable development strategy, premised on social and environmental responsibility, operational safety, investments in technology, and the recognition of human resources, is yielding positive outcomes. I am very proud to have had the opportunity to be a part of these achievements after nearly 7 years as CEO of Petrobras, and to see that during this period Petrobras has consolidated its position of leadership as an integrated energy company and has built the foundations to continue growing.

173.    On February 29, 2012, Petrobras filed a Form 6-K with the SEC setting forth the
Company's financial statements for 2011 setting forth figures substantially similar to those set
forth in the Company's earlier press release.

174.    On April 2, 2012, Petrobras and PifCo filed an Annual Report on Form 20-F for
2011 setting forth substantially similar figures as those set forth in the Company's earlier press
release.  The Form 20-F also included certifications substantially similar to those described in
paragraphs 134 and 135, signed by CEO Foster and CFO Barbassa.

175.    On April 27, 2012, Petrobras issued a press release announcing that its Board of
Directors had, that day, approved the nomination of José Carlos Cosenza to replace Paulo Roberto
Costa.  The press release also announced that Costa would resign from his current position.

176.    On May 15, 2012, Petrobras issued a press release announcing the Company's
results of operations for the first quarter of 2012.  The Company reported total assets of
$338 billion including net property, plant, and equipment of $194 billion, depreciation, depletion,
and amortization of $2.7 billion, and net income of $5.3 billion.

177.    In connection with these results, CEO Foster stated in part:

> My main focus, and that of the entire executive team, will be on
> executing the business plan, while ensuring operational efficiency
> and exercising control over costs.  Whenever necessary, *we will
> not hesitate to make adjustments and corrections, using the best
> technical and financial analysis procedures*, preserving the
> liquidity and solvency of the Company and ensuring that it retains
> its investment grade status.

178.    On May 17, 2012, Petrobras filed a Form 6-K with the SEC setting forth the
Company's financial statements for the three-month period ending March 31, 2012 with figures
substantially similar to those set forth in the Company's earlier press release.

179.    On or about June 25, 2012, Petrobras hosted a presentation and conference call in
New York, New York to offer details of the Company's 2012–2016 Business and Management

Plan. As part of the presentation, Petrobras described certain initiatives relating to project management, including discussions of capital discipline (described as "ensur[ing] expansion with solid financial indicators") and of the Company's plans to spend more than $141 billion on exploration and production. These capital expenditures were presented based on the explicit assumption of Petrobras maintaining its investment grade, including "Leverage lower than 35%." The 2012–2016 Business and Management Plan projected that Petrobras would have to borrow approximately $80 billion through the debt markets to fund these activities.

180.     On August 3, 2012, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2012. The Company reported total assets of $311 billion including net property, plant, and equipment of $185 billion, depreciation, depletion, and amortization of $2.7 billion, and a net loss of $953 million.

181.     In connection with these results, CEO Foster stated in part:

> The new Plan focuses on oil and gas production in Brazil and is underpinned by realism, precise targets  and rigorous project management with capital discipline. Since its publication, we have made advances with several important issues. Recent examples include *the signature of contracts for the construction of drilling rigs and pre-salt replicant platform topsides*. . . . We will also continue with our efforts to recover the operational efficiency of the Campos Basin and optimize operating costs, two essential vectors for ensuring better results.

182.     On August 10, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the six-month period ending June 30, 2012 with figures substantially similar to those set forth in the Company's earlier press release.

183.     On August 29, 2012, Petrobras, PifCo, and PGF filed the 2012 Registration Statement. The 2012 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including the Company's Annual Report on Form 20-F for the year ended December 31, 2011, which had been filed with the SEC on March

30, 2012. The 2012 Registration Statement also incorporated, among other documents, "[a]ny future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

184.    On October 26, 2012, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2012. The Company reported total assets of $318 billion including net property, plant, and equipment of $191 billion, depreciation, depletion, and amortization of $2.6 billion, and net income of $2.8 billion.

185.    In connection with these results, CEO Foster stated in part:

> We also continued with our funding program for the Business and Management Plan (PNG).   In an operation concluded at the beginning of October and characterized by strong demand, we tapped into the EUR and GBP markets for the second time, raising the equivalent of U.S.$3.3 billion for up to 11 years, at extremely attractive rates. At this point, I would just like to reemphasize that *I will be closely monitoring the* liquidity and *leverage limits established by our Board of Directors, which are essential vectors for ensuring the financeability of the PNG*.

186.    On October 30, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the nine-month period ending September 30, 2012, with substantially similar figures as those set forth in the Company's earlier press release.

187.    On February 4, 2013, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2012. For 2012, the Company reported total assets of $332 billion including net property, plant, and equipment of $205 billion, depreciation, depletion, and amortization of $11.1 billion, and net income of $10.9 billion.

188.    In connection with these results, CEO Gabrielli stated in part:

> Despite the adversities faced by Petrobras in 2012, I would like to reiterate my strong belief in the Company's medium and long-term prospects. This Administration fully recognizes the difficulties we face and is working ceaselessly to overcome them. *Following an extensive and detailed diagnosis of our operating problems*, we

defined priorities and implemented short and medium-term structuring initiatives to improve our financial and economic results.

*       *       *

*I would like to highlight the Executive Board meetings, which are now held twice weekly to focus on the physical and financial monitoring of the principal projects in our investment plan*. We have also implemented a number of important structural and organizational changes throughout the Company during 2012, enhancing efficiency, while at the same time promoting needed administrative changes. We are fully aware that only the constant pursuit of efficiency will allow us to achieve permanent gains that will improve the Company's long term profitability, which is this Administration's primary objective.

189.    On February 6, 2013, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for 2012 setting forth figures substantially similar to those set forth in the Company's earlier press release.

190.    On March 15, 2013, Petrobras issued a press release announcing that the Company's Board had "approved the 2013-2017 Business & Management Plan (2013-17 BP), with investments of US$ 236.7 [billion]." The 2013-2017 Business Plan set forth the projection that Petrobras would meet the funding requirements for these investments in part by issuing $21.4 billion in debt.

191.    On April 26, 2013, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2013. The Company reported total assets of $345 billion including net property, plant, and equipment of $214 billion, depreciation, depletion, and amortization of $3.2 billion, and net income of $3.9 billion.

192.    In connection with these results, CEO Foster stated in part:

We are doing our homework, and results are being delivered as planned. *I constantly monitor the progress of our investment projects and structuring programs with the Directors, Executive Managers, and all other leaders involved*. I regard the increased

> integration between the Company's areas and their teams as
> extremely positive; the proper management of our project portfolio
> provides us with the confidence that we will be able to achieve the
> goals of 2013-17 BMP, which will guarantee the returns expected
> by our shareholders and investors.

193.    On April 29, 2013, Petrobras filed an Annual Report on Form 20-F setting forth

substantially similar figures as those set forth in the Company's earlier press release. The Form

20-F also included certifications substantially similar to those described in paragraphs 134 and

135, signed by CEO Foster and CFO Barbassa.

194.    On April 30, 2013, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the three-month period ending March 31, 2013 with figures

substantially similar to those set forth in the Company's earlier press release.

195.    On May 13, 2013, Petrobras issued a press release announcing the pricing of the

2013 Notes, $11 billion in debt securities to be issued by PGF. On May 15, 2013, PGF filed a

prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes.

196.    The 2013 Offering Documents offered the 2013 Notes, which included six series

of notes: (1) $1.25 billion of notes paying 2.00% due in 2016 to be sold at $995.84 per $1000 par

value; (2) $2 billion of notes paying 3.00% due in 2019 to be sold at $993.52 per $1000 par value;

(3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per $1000 par value;

(4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1000 par value;

(5) $1 billion of floating-rate notes due in 2016 to be sold at par; and (6) $1.5 billion of floating-

rate notes due 2019 to be sold at par.

197.    The 2013 Offering Documents incorporated by reference, among other documents,

the Company's Annual Report on Form 20-F for the year ended December 31, 2012, filed with

the SEC on April 29, 2013, which included descriptions of Petrobras, its asset values, expenses,

net income, and its internal controls. For example, the incorporated Annual Report on Form 20-F

stated that Petrobras held assets valued at $332 billion, including property, plant, and equipment

valued at $205 billion as of December 31, 2012.

198.    On May 23, 2013, Petrobras issued a press release announcing that the sale of the

2013 Notes had closed on May 20, 2013, noting in part:

> The transaction was executed in one day, with a demand of
> approximately US$ 42 billion as a result of more than 2,000
> orders. The average interest rate of the notes was 3.79% with an
> average life of 10.37 years. This deal sets the following records:
>
> ➢ Largest Emerging Market USD bond offering ever
> ➢ 5th largest USD bond offering ever
> ➢ 2nd largest USD bond offering this year
>
> The final allocation had the following distribution: United States
> (73%), Europe (17%) and Asia (7%), mostly dedicated to the high
> grade market.
>
> ***The success of the transaction indicates investor confidence in
> the fundamentals of the Company, its growth strategy and its
> commitment to maintain investment grade rating***, as indicated by
> debt ratio targets and significant cash flow.

199.    On August 9, 2013, Petrobras issued a press release announcing the Company's

results of operations for the second quarter of 2013. The Company reported total assets of

$338 billion including net property, plant, and equipment of $204 billion, depreciation, depletion,

and amortization of $3.4 billion, and net income of $2.7 billion.

200.    In connection with these results, CEO Foster stated in part:

> I would also like to highlight the second quarter's successful
> funding operations, especially the US$ 11 billion bond issue in
> May. As a result, our cash and cash equivalents closed the period
> at US$ 33 billion.
>
> *          *          *
>
> Once again, I would like to reiterate the Executive Board's
> confidence in our technical team and affirm that our short-term
> growth prospects are achievable. ***Our day-to-day efforts are
> aimed at building a more efficient and profitable Company.*** We

have already overcome countless expected challenges in 2013 and
are convinced that we will achieve the goals and objectives set out
in the 2013-2017 Business and Management Plan.

201.    On August 13, 2013, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the six-month period ending June 30, 2013 setting forth

figures substantially similar to those set forth in the Company's earlier press release.

202.    On October 25, 2013, Petrobras issued a press release announcing the Company's

results of operations for the third quarter of 2013.  The Company reported total assets of

$340 billion including net property, plant, and equipment of $208 billion, depreciation, depletion,

and amortization of $3.3 billion, and net income of $1.5 billion.

203.    In connection with these results, CEO Foster stated in part:

> Our investment plan is indeed robust, due to the size of our
> reserves in both pre-salt and post-salt horizons and the
> opportunities to develop them with demonstrated know-how and
> capacity.  These production development projects will increase our
> oil and gas production, bringing needed increase in operating cash
> flow generation, which will be additive to the beneficial effect of
> price alignment that we are pursuing.  ***Thus we expect to reduce
> over the coming months our leverage and indebtedness
> indicators.***

204.    On October 28, 2013, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the nine-month period ending September 30, 2013 with

figures substantially similar to those set forth in the Company's earlier press release.

205.    On February 25, 2014, Petrobras issued a press release announcing that the

Company's Board had "approved the 2030 Strategic Plan (SP 2030) and the 2014 – 2018

Business and Management Plan (BMP 2014-2018)."  The 2013-2017 Business Plan set forth the

projection that Petrobras would meet the funding requirements for these investments in part by

issuing $5.6 billion in debt.

206.   Also on February 25, 2014, the Company issued a press release announcing its

results of operations for the fourth quarter and full year of 2013. For 2013, the Company reported

total assets of $321 billion including net property, plant, and equipment of $228 billion,

depreciation, depletion, and amortization of $13.2 billion, and net income of $10.8 billion.

207.   In connection with these results, CEO Gabrielli stated in part:

> 2013 stands out for the successful implementation of our
> Structuring Programs, which by establishing new benchmarks for
> productivity and management of investment projects, *imposed*
> *discipline in the use of the company's financial resources.*
>
> \*      \*      \*
>
> Additionally, I would like to notice that *in the second half of 2013*
> *we implemented the Corruption Prevention Program*, reaffirming
> the commitment of the Petrobras Executive Board and of its
> employees with ethics and transparency at our organization. The
> program complies with both national and international initiatives
> against fraud and corruption, as well as with the laws of the
> countries where Petrobras operates, with positive impacts in the
> relations with all its stakeholders.

208.   On February 26, 2014, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for 2013 with figures substantially similar to those set forth in the

Company's earlier press release.

209.   On March 7, 2014, Petrobras issued a press release regarding its management's

report on internal control over financial reporting, stating in relevant part:

> Our management has assessed the effectiveness of our internal
> control over financial reporting as of December 31, 2013, based on
> the criteria established in Internal Control—Integrated Framework
> (1992) issued by the Committee of Sponsoring Organizations of
> the Treadway Commission (COSO). *Based on such assessment*
> *and criteria, the Company's management has concluded that*
> *Company's internal control over financial reporting was effective*
> *as of December 31, 2013.*

210. On March 10, 2014, Petrobras filed a Form 6-K/A with the SEC setting forth substantially the same content as in the March 7, 2014 press release, accompanied by the report of KPMG Auditores Independentes.

211. Also on March 10, 2014, Petrobras issued a press release announcing the pricing of the 2014 Notes, $8.5 billion in debt securities to be issued by PGF. On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes pursuant to the 2012 Registration Statement.

212. The 2014 Offering Documents offered the 2014 Notes, which included six series of notes: (1) $1.6 billion of notes paying 3.250% due in 2017 to be sold at $999.57 per $1000 par value; (2) $1.5 billion of notes paying 4.875% due in 2020 to be sold at $997.43 per $1000 par value; (3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1000 par value; (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66 per $1000 par value; (5) $1 billion of floating-rate notes due in 2017 to be sold at par; and (6) $500 million of floating-rate notes due 2020 to be sold at par.

213. The 2014 Offering Documents incorporated by reference, among other documents, the Company's report on Form 6-K filed with the SEC on March 7, 2014, containing management's report on internal control over financial reporting described above.

214. However, these statements were false and misleading because, as part of a scheme to enrich certain influential individuals within Petrobras and other organizations, certain executives within Petrobras and other individuals received bribes in connection with certain construction projects and asset purchases undertaken by the Company. For example, as part of Petrobras' process for awarding construction contracts, these Petrobras executives and others were paid illicit amounts by the construction companies submitting bids for the contracts, in

exchange for which the construction companies were awarded the contracts.  These substantial bribe-related expenses were then repaid to the construction companies, facilitating the bribery scheme.

215.   Petrobras concealed these improper bribe-related repayments by including them in the value of the assets acquired by or constructed under contract for the Company.  These artificially inflated values, improperly treated as costs related to the construction, installation, and completion of oil and gas infrastructure, were then capitalized by recording them as part of the value of the acquired assets on the Company's balance sheet.

216.   Petrobras then recognized expenses for the depreciation of these assets—including the bribe-related repayments—over subsequent periods.  Petrobras further calculated and reported the Company's periodic net income based, in part, on these depreciation-related expense figures.

### 2.   The Truth Begins to Come to Light

217.   On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote. The announcement went on to note that:

> Director Mauro Rodrigues da Cunha *voted against the approval of the Financial Statements* of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) *lack of information and apparent accounting inadequacy of refinery investments*.

218.   Also on or about March 17, 2014, the DPF launched operation Car Wash, focused on a scheme run by black-market money dealers who are thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.

219.    On or about March 20, 2014, the federal police force of Brazil arrested Paulo Costa, a former senior executive of Petrobras in connection with Operation Car Wash based on documentation linking Costa to the receipt of a luxury automobile from another individual implicated in the money laundering scheme.

220.    On April 15, 2014, during the trading session, CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's purchase of the Pasadena Refinery and allegations regarding bribery.  As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts that could have been the subject of participation by Costa.

221.    On April 30, 2014, Petrobras filed an Annual Report on Form 20-F setting forth figures substantially similar to those set forth in the Company's press release dated February 25, 2014.  The Form 20-F also included certifications substantially similar to those described in paragraphs 134 and 135, signed by CEO Foster and CFO Barbassa.

222.    On May 9, 2014, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2014.  The Company reported total assets of $354 billion including net property, plant, and equipment of $241 billion, depreciation, depletion, and amortization of $3.0 billion, and net income of $2.4 billion.

223.    In connection with these results, CEO Foster stated in part:

> The Company continues to have broad access to the sources of funding necessary for the development of its Business and Management Plan.  In the 1Q-2014, we raised US$ 22.8 billion, mainly by issuing bonds in the U.S. and European markets, which allowed us to end the quarter with strong liquidity of US$ 34.7 billion in cash, considering the balance of cash, cash equivalents and government bonds.  These resources are sufficient to finance investments in 2014 . . . .

\*       \*       \*

> I would like to register, once again, the commitment of Petrobras
> Executive Board and of its employees with ethics and transparency
> at our organization, as expressed when we launched in the 2nd half
> of 2013, the Corruption Prevention Program. All the allegations
> presented are and will continue to be investigated through the
> mechanisms created for this specific purpose.

224.    On May 12, 2014, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the three-month period ending March 31, 2014 with figures

substantially similar to those set forth in the Company's earlier press release.

225.    On August 8, 2014, Petrobras issued a press release announcing the Company's

results of operations for the second quarter of 2014. The Company reported total assets of

$363 billion including net property, plant, and equipment of $254 billion, depreciation, depletion,

and amortization of $3.5 billion, and net income of $2.3 billion.

226.    In connection with these results, CEO Foster stated in part:

> I would like to conclude this letter to our investors and
> shareholders by restating that the rise in oil, natural gas and refined
> products production, especially diesel and gasoline, is already a
> reality in our day-to-day activities. In addition to boosting
> production and reducing costs, we remain committed to adjusting
> Brazilian prices for oil products with those in the international
> market in order to achieve the Net Debt/EBITDA and Leverage
> targets within the limits and deadlines imposed by the Board of
> Directors to the Executive Board in November 2013.

227.    On August 11, 2014, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the six-month period ending June 30, 2014 with figures

substantially similar to those set forth in the Company's earlier press release.

228.    On or about September 18, 2014 news reports circulated that Costa had admitted to

Brazilian prosecutors that he had received 1.5 million Brazilian reais, or approximately $636,000,

in connection with Petrobras' purchase of the Pasadena Refinery. This payment was described as

a portion of a larger total of illicit payments made in connection with the asset purchase.

229.    On or about October 9, 2014, recordings of testimony by Costa given in Brazilian court were released.  As part of his statement, Costa testified that bribes had been paid in connection with the award of contracts by Transpetro, a segment of Petrobras, implicating Sergio Machado ("Machado"), then the director of Transpetro.

230.    On October 16, 2014, prior to the trading session, news reports circulated of a report issued by the TCU criticizing the management of the construction of the COMPERJ facility, describing the project's management as "reckless" and identifying concerns about inflated contracts costs.

231.    In reaction to this partial revelation of the extent to which Petrobras' construction contracting process was subject to improper overpricing, and the related effects on the reported value of the Company's assets, the market value of certain securities issued by Petrobras, PifCo, and PGF fell.  For example, the Company's common and preferred ADS prices fell $1.05 and $1.30 per share respectively, or 6.75 and 7.87 percent, to close at $14.50 and $15.21 per ADS.

232.    On October 27, 2014, Petrobras issued a press release entitled "Internal steps taken by Petrobras in response to 'Lava Jato Operation.'"  The Company noted that it was taking certain steps in response to the developing investigation, including:

> sign[ing] contracts with two independent investigation companies, a Brazilian and an American, with the aim of examining the nature, extension and impacts of the actions that might have been performed against the Company in the context of what have been said by former Director Paulo Roberto Costa.  These companies will also analyze correlated facts and circumstances that might have material impact over the Company's business.

233.    On November 3, 2014, Petrobras issued a press release announcing that Machado had "presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the next 31 days."

234.    On November 13, 2014, during the trading session, Petrobras disclosed that it would have to delay its release of earnings results for the third quarter of 2014.  This delay arose from the refusal of Petrobras' auditor, PwC, to approve the Company's financial reports for the third quarter of 2014 due to concerns related to the accounting effects of the bribery scheme involving Petrobras.

235.    In response to this partial disclosure that Petrobras suffered from material weaknesses in its internal controls, the value of Company's assets was artificially overstated by including the value of bribery payments in the capitalized value of certain assets, and the Company's reported expenses and net income were materially false as a result of this improper capitalization and depreciation of bribery payments, the market value of certain securities issued by Petrobras, PifCo, and PGF fell.  For example, the Company's common and preferred ADS prices fell $0.36 and $0.46 per share, respectively, on November 13, declines of 3.41 and 4.19 percent, to close at $10.20 and $10.52 per share that day.  Similarly, the 5.625% note due in 2043 offered among the 2013 Notes declined in value by $18.77 per $1000, or 2.14 percent, to close at $859.60 per $1000 par value.

236.    Then, on November 14, 2014, prior to the trading session, Petrobras revealed that it would "release its third quarter 2014 financial statements, *without a review by its Independent Auditors*."  Petrobras further noted that:

> In light of the ongoing investigations, *it is currently not possible for the Company to determine an estimated date* for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

That same day, news reports circulated that Brazilian police had raided the offices of certain construction and engineering firms, including Odebrecht, seizing documents and arresting a number of individuals suspected of involvement in the bribery scheme.

237.    In response to these partial disclosures that Petrobras suffered from material

weaknesses in its internal controls, the value of Company's assets was artificially overstated by

including the value of bribery payments in the capitalized value of certain assets, and the

Company's reported expenses and net income were materially false as a result of this improper

capitalization and depreciation of bribery payments, the market value of certain securities issued

by Petrobras, PifCo, and PGF fell.  For example, the Company's common and preferred ADS

prices fell $0.25 and $0.29 per ADS, respectively, on November 14, declines of 2.45 and 2.76

percent, to close at $9.95 and $10.23 per share that day.   Similarly, the 5.625% note due in 2043

offered among the 2013 Notes declined in value by $50.88 per $1000, or 5.92 percent, to close at

$808.72 per $1000 par value.

238.    On November 17, 2014, Petrobras hosted a conference call for analysts and

investors to discuss certain aspects of the Company's operations for the third quarter of 2014,

provide additional detail regarding the Company's delayed financial statements, and offer

commentary on the effects on Petrobras of the unfolding bribery accusations.

239.    In connection with these results, CEO Foster stated in part:

> In light of the accusations and investigations of [O]peration Car
> Wash . . . Petrobras is unable to publish its third-quarter 2014
> financial statements because these accusations, if found to be true,
> could potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the
> depositions of former Downstream Executive Director, Mr. Paulo
> Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th
> Federal Court of Parana, revealed information that may lead to
> possible adjustments in the financial statements of our Company.
>
> Because of these depositions, therefore, *we need more time to
> make any possible adjustments to the financial statements*. More
> time is needed as well to gain greater understanding from the
> ongoing investigations by the independent law firms; and *we need
> more time, as it is fundamentally important to improve our
> internal controls*.

Later, during the question-and-answer portion of the call, CFO Barbassa and CEO Foster

engaged in the following exchanges in part:

> **[Analyst]:** [I]f we suppose . . . BRL5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company? What are the main line items that would be impacted?
>
> **CFO Barbassa:** The adjustment that perhaps could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, ***this value should be removed from PP&E line item [adjusted] value*** and should be taken to the result.
>
> *   *   *
>
> **CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court. This was what the judges are calling evidence, temporary evidence. So in this case, we have a schedule of activities and we have deadlines to each one of these activities.
>
> For example, there is definition of criteria to measure the effects of losses caused by fraud. · In here, ***in an objective and material fashion, our reference will be the depositions made so far***, the evidence provided that will be submitted to Petrobras by the Federal Police. ***We will then use this evidence to have our write-downs, and do the write-downs year after year*** regarding companies A, B, C or D that we might have contracted.

240.    In response to this partial disclosure of the extent to which Petrobras suffered

from material weaknesses in its internal controls, the value of Company's assets was artificially

overstated by including the value of bribery payments in the capitalized value of certain assets,

and the Company's reported expenses and net income were materially false as a result of the

improper capitalization and depreciation of bribery payments, the market value of certain

securities issued by Petrobras, PifCo, and PGF fell. For example, the Company's common and

preferred ADS prices fell $0.62 and $0.59 per share, respectively, or 6.23 and 5.77 percent, to

close at $9.33 and $9.64 per ADS. Similarly, the 4.375% note due in 2023 issued among the

2013 Notes fell $9.16 per $1000, or more than $35.8 million in market value, to close the day's trading session at $887.03 per $1000 par value.

### 3.   **The Truth Is Fully Revealed**

241.    On November 24, 2014, prior to the trading session, Petrobras issued a press release announcing that the Company had received a subpoena from the SEC on November 21, 2014. The press release revealed that Petrobras was under investigation by the SEC and that the Company would be required to produce certain documents to the agency.

242.    In reaction to Petrobras' admission that the Company was under investigation relating to material weaknesses in its internal controls, the valuation of the Company's assets, and as a result, the Company's periodic reported expenses and net income, the market value of certain securities issued by Petrobras, PifCo, and PGF fell. For example, the Company's common and preferred ADS prices fell $0.34 and $0.38 per share respectively, or 3.14 and 3.32 percent, to close at $10.50 and $11.06 per ADS. Similarly, the floating-rate note due in 2016 offered among the 2013 Notes declined in value by $3.59 per $1000, or 0.37 percent, to close at $96.875 per $1000 par value.

243.    The Exchange Act Defendants' false statements and omissions during the Class Period caused the securities issued by Petrobras, PifCo, and PGF to trade at artificially inflated prices during the Class Period. However, as the conditions described above were revealed to the market, the market prices for securities of Petrobras, PifCo, and PGF fell. For example, the price of the Company's common ADSs fell by $39.58 per share—or 80.92 percent—from its Class Period-high closing price of $48.91 per ADS on January 6, 2010. Similarly, the price of the Company's preferred ADSs fell by $34.19 per share—or 78.01 percent—from its Class Period-high closing price of $43.83 per ADS on January 4, 2010.

244.    The true facts, which were known to, or recklessly disregarded by, the Exchange Act Defendants and concealed from the purchasers of the securities of Petrobras, PifCo, and PGF and the investing public during the Class Period, were as follows:

(a)    the periodically reported value of the Company's assets was false and misleading because the costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values;

(b)    had the illegal bribe-related repayments been properly accounted for, the Company would have recognized materially greater expenses and less net income in certain periods.  Accordingly, during the Class Period, the Company's reported expenses and net income were false and misleading;

(c)    the Company suffered from material weaknesses in: (1) its disclosure controls and procedures, and (2) its internal controls over financial reporting; and

(d)    Defendants' statements regarding the outlook and prospects of the Company were materially false and misleading at all relevant times.

C.    **Loss Causation**

245.    During the Class Period, as detailed herein, the Exchange Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by Petrobras, PifCo, and PGF, and operated as a fraud or deceit on Class-Period purchasers of such securities by misrepresenting Petrobras' asset values, expenses, net income, and whether the Company suffered from material weaknesses in internal controls.

246.    Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the price of the securities of Petrobras, PifCo, and PGF fell as the prior artificial inflation came out of their respective prices. As a result of their purchases of the securities issued by Petrobras, PifCo, and PGF during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**D.    Inapplicability of Statutory Safe Harbor**

247.    The Exchange Act Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

248.    The Exchange Act Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of the securities of Petrobras, PifCo, and/or PGF who knew that the FLS was false. None of the historic or present tense statements made by the Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

**E.    Scienter Allegations**

249.    During the Class Period, the Exchange Act Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at

the time for the reasons discussed above. In so doing, the Exchange Act Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of the securities of Petrobras, PifCo, and/or PGF during the Class Period.

F.    **Presumption of Reliance**

250.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the securities of Petrobras, PifCo, and PGF traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the securities of Petrobras, PifCo, and PGF; and

(e)    Plaintiff and other members of the Class purchased the securities of Petrobras, PifCo, and/or PGF between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

251.   At all relevant times, the markets for the securities of Petrobras, PifCo, and PGF were efficient for the following reasons, among others:

(a)    as a regulated issuer, Petrobras filed periodic public reports with the SEC on a consolidated basis, including information on behalf of its subsidiaries PifCo and PGF;

(b)    Petrobras regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Petrobras was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     the securities of Petrobras, PifCo, and PGF were actively traded in efficient markets, including the NYSE, where the Company's common and preferred ADSs trade under the ticker symbols "PBR" and "PBR/A," respectively.

252.    As a result of the foregoing, the markets for the securities of Petrobras, PifCo, and PGF promptly digested current information regarding the Company and its subsidiaries from all publicly available sources and reflected such information in the prices of the securities of Petrobras, PifCo, and PGF.  Under these circumstances, all purchasers of the securities of Petrobras, PifCo, and/or PGF during the Class Period suffered similar injury through their purchase of the such securities at artificially inflated prices and the presumption of reliance applies.

253.    Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its subsidiaries, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

### G.     Counts Against the Exchange Act Defendants

### COUNT IV

**For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against the Exchange Act Defendants**

254.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 253 by reference.

255. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew to be false and misleading, or were reckless in their disregard as to the truth of such statements, in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

256. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes, and artifices to defraud;

    (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the securities of Petrobras, PifCo, and/or PGF during the Class Period.

257. Plaintiff and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the securities of Petrobras, PifCo, and/or PGF.  Plaintiff and other members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

258. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the securities of Petrobras, PifCo, and/or PGF during the Class Period.

## COUNT V

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

259.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 258 by reference.

260.    The Individual Defendants acted as controlling persons of Petrobras, PifCo, and/or PGF within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of Petrobras, PifCo, and/or PGF and the employees thereof.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Plaintiff and the members of the Class damages and interest;

C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## IX.   JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  December 24, 2014

Respectfully submitted,

Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
E-mail: ckeller@labaton.com
ebelfi@labaton.com
mstocker@labaton.com

*Counsel for Plaintiff*
*City of Providence*

## CERTIFICATION

I, Jeffrey Padwa, City Solicitor for the City of Providence, Rhode Island, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of City of Providence ("Providence"). I have reviewed a complaint prepared against Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), alleging violations of the federal securities laws, and authorized its filing;

2.      Providence did not purchase securities of Petrobras at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Providence is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Providence's transactions in Petrobras securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Providence has sought to serve as a lead plaintiff in the following class action under the federal securities laws during the last three years:

*City of Providence, Rhode Island v. Bats Global Markets, Inc.*, No. 1:14-cv-2811 (S.D.N.Y.)

6.      Providence is currently serving as a lead plaintiff in the following class action under the federal securities laws filed during the last three years:

*City of Providence, Rhode Island v. Bats Global Markets, Inc.*, No. 1:14-cv-2811 (S.D.N.Y.)

7.      Beyond its pro rata share of any recovery, Providence will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ___23rd___ day of December, 2014.

Jeffrey Padwa
*City Solicitor, City of Providence, Rhode Island*

2

EXHIBIT A

TRANSACTIONS IN PETRÓLEO BRASILEIRO S.A. – PETROBRAS

CUSIP 71654V101

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 03/01/12 | 22,050.00 | $28.6444 | ($631,609.02) |
| Purchase | 03/13/12 | 1,730.00 | $25.9379 | ($44,872.57) |
| Purchase | 04/30/12 | 3,020.00 | $22.1529 | ($66,901.76) |
| Purchase | 06/14/12 | 1,930.00 | $17.7600 | ($34,276.80) |
| Purchase | 04/12/13 | 4,150.00 | $18.0425 | ($74,876.38) |
| Purchase | 11/25/13 | 2,500.00 | $17.7794 | ($44,448.50) |
| Purchase | 12/04/13 | 7,310.00 | $14.7982 | ($108,174.84) |
| Purchase | 01/07/14 | 4,700.00 | $14.0340 | ($65,959.80) |
| Purchase | 01/31/14 | 5,860.00 | $12.3179 | ($72,182.89) |
| Sale | 07/18/14 | -3,440.00 | $18.1570 | $62,460.08 |
| Sale | 08/25/14 | -5,220.00 | $19.0601 | $99,493.72 |
| Sale | 08/28/14 | -8,260.00 | $20.3650 | $168,214.90 |
| Sale | 09/03/14 | -1,811.00 | $21.6783 | $39,259.40 |
| Sale | 09/03/14 | -969.00 | $21.3283 | $20,667.12 |
| Purchase | 09/12/14 | 1,540.00 | $17.2750 | ($26,603.50) |
| Purchase | 09/25/14 | 1,250.00 | $16.6452 | ($20,806.50) |
| Purchase | 10/29/14 | 6,804.00 | $11.8800 | ($80,831.52) |
| Purchase | 10/29/14 | 10,206.00 | $11.9516 | ($121,978.03) |

CUSIP 71645WAP6

| Transaction Type | Trade Date | Par Amount | Price | Cost / Proceeds |
|---|---|---|---|---|
| Sale | 08/19/10 | -$205,000.00 | $109.5700 | $224,618.50 |
| Sale | 03/22/11 | -$30,000.00 | $104.7500 | $31,425.00 |
| Sale | 04/19/11 | -$25,000.00 | $103.4700 | $25,867.50 |
| Sale | 05/20/11 | -$50,000.00 | $106.5500 | $53,275.00 |
| Sale | 06/09/11 | -$40,000.00 | $106.2500 | $42,500.00 |

### CUSIP 71645WAR2

| Transaction Type | Trade Date | Par Amount | Price | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 09/18/14 | $125,000.00 | $103.1170 | ($128,896.25) |

### CUSIP 71645WAV3

| Transaction Type | Trade Date | Par Amount | Price | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 02/01/12 | $160,000.00 | $99.4990 | ($159,198.40) |
| Sale | 02/08/12 | -$160,000.00 | $101.3000 | $162,080.00 |

### CUSIP 71647NAB5

| Transaction Type | Trade Date | Par Amount | Price | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 09/24/13 | $205,000.00 | $94.1870 | ($193,083.35) |
| Sale | 01/30/14 | -$205,000.00 | $94.2600 | $193,233.00 |

### CUSIP 71647NAF6

| Transaction Type | Trade Date | Par Amount | Price | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 05/13/13 | $210,000.00 | $98.8280 | ($207,538.80) |
| Sale | 09/24/13 | -$210,000.00 | $91.9680 | $193,132.30 |
| Purchase | 01/30/14 | $140,000.00 | $88.4800 | ($123,872.00) |
| Sale | 05/13/14 | -$140,000.00 | $94.3990 | $132,158.60 |

### CUSIP 71647NAG4

| Transaction Type | Trade Date | Par Amount | Price | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 03/10/14 | $145,000.00 | $99.9570 | ($144,937.65) |
| Sale | 04/03/14 | -$145,000.00 | $100.5100 | $145,739.50 |

CUSIP 71647NAH2

| Transaction Type | Trade Date | Par Amount | Price | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 05/13/14 | $130,000.00 | $102.2350 | ($132,905.50) |
| Sale | 09/18/14 | -$130,000.00 | $102.6150 | $133,399.50 |